UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )
v.                             )        No.  4:05CR090 CEJ
                               )
DAVID LEE WILLIE,              )
                               )
        Defendant.             )

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).  A hearing was held on the pretrial motions on March 28, 2005, and a supplemental hearing was held on April 11, 2005.

**(Doc. #15) Defendant's Motion to Suppress Evidence and Statements**

Based upon the evidence adduced at the hearings on the motion to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

William Knittel is an officer with the Eureka, Missouri police department, and has been so employed for approximately six years.  He has received numerous in-service training classes on the detection and dangers of methamphetamine production, and methamphetamine use and possession.  He has, on at least one prior occasion, been involved in the search of an active methamphetamine lab, and has smelled anhydrous ammonia that was used in the production of methamphetamine.  He knows anhydrous ammonia and other chemicals used in the production of methamphetamine to be very

dangerous in that they can scar and burn lungs and are explosive. He knows that the chemicals, particularly anhydrous ammonia, are very harmful to breathe in any strength.

On June 10, 2003, at about 4 a.m., he was on patrol in Eureka, Missouri. On that date, as part of his routine patrol, he entered the parking lot of the Super 8 Motel on Fifth Street. As he drove to the west side of the lot, he noticed a blue/green car which was parked blocking a fire lane to the building which was clearly marked on the curb as a "fire lane" and as a "no parking" area. This car was parked next to a door to the motel, and a person who he observed was loading boxes which apparently came from the motel into the car. Because the person was parked in a fire lane and moving boxes to a car at a very early hour of the morning, Knittel approached the vehicle in order to write a summons for the illegal parking and to possibly further investigate the circumstances of the defendant's activity. As he approached the car, he noticed that the car was full of boxes in the backseat area and in other places.

As he reached the window of the car in which the driver was sitting, he recognized the driver and the person loading merchandise in the car to be David Willie, the defendant. He was aware from prior encounters with Willie that he was a resident of Eureka, Missouri, and lived on the south side of town in an apartment complex with his wife. He thought it was very strange that Willie, who he knew to be a resident of the town, would be at the motel at 4 a.m. loading boxes into his vehicle. He asked the defendant for his driver's license, and the defendant produced his driver's license in the name of David Willie. While he was talking to the defendant, he noticed that there was a strong odor of ammonia emanating both from Willie's body and pores as he sweated, and from the vehicle itself. The smell was strong, and Knittel believed it to be anhydrous ammonia. Knittel noticed, while asking the defendant brief questions, that the defendant was extremely nervous particularly considering that

he was only approaching him, as far as the defendant was aware, to write him a ticket for a parking violation. Knittel also noticed that there were also several open sores on the defendant's face and other parts of his body. Open sores, such as the one that Knittel observed, Knittel knows to be associated with methamphetamine use and abuse. All of this made Knittel very suspicious that the defendant was transporting methamphetamine or the components needed to set up a methamphetamine lab in his vehicle. Knittel asked the defendant why he was at the motel. The defendant told Knittel that he and his wife were separated, and that he had moved into the motel after he and his wife had separated, and he had taken all of the clothing and miscellaneous matter from his apartment to the motel room. He stated that he was now loading his wife's clothing back into the vehicle to take it to her. Knittel asked where his wife was located, and the defendant stated he did not know her location. Knittel thought this was suspicious because the defendant would have no way of returning clothing to her if he was not aware of her location. In addition, Knittel was aware that just prior to this, the defendant had reported his wife missing to the Eureka Police Department. Because of all of this, Knittel asked the defendant if he had any methamphetamine-making equipment in his car, and the defendant stated that he did not.

By this time, the defendant was out of his car and standing at the back of his vehicle. Knittel asked the defendant to remain standing at the back of the vehicle while he wrote out a parking summons, and Knittel returned to his car and started to write out the summons. He observed that the defendant left the back of the car, got into the back of the car, and appeared to be reaching in various areas of the car as if he were concealing something. The defendant then again exited the vehicle and stood at the back of the car.

A short time after this and within two to three minutes after Knittel had approached the defendant, Officer Michael Smith of the Eureka Police Department arrived on the scene. Officer Smith observed the defendant standing at the rear of the car and Knittel to be in his vehicle. Officer Smith had responded to the scene because Knittel had indicated that there was a suspicious vehicle parked at that location. Smith parked his vehicle and approached the defendant. As Smith approached the defendant, he noticed that he had a pocket knife in the pocket of his blue jeans. Because Smith was not certain whether or not the defendant had any other weapons on his person, Smith asked the defendant if it was okay if he searched his pockets. The defendant told Smith that it was okay if he searched the pockets. Smith looked in the pocket which contained the knife and removed the knife pursuant to the permission given. As he removed the knife, he noticed a "cut" straw which was in the defendant's pocket. Smith recognized this possibly to be a device used to consume methamphetamine. When he removed the straw from the defendant's pocket, he noticed a white crystalline substance consistent with methamphetamine to be on the inside of the straw. Because of this, Smith placed the defendant under arrest for possession of drug paraphernalia. The straw was then tested and the substance in the straw field-tested positive to be methamphetamine.

As Smith was placing handcuffs on the defendant, Knittel noticed that the defendant had evidently been placed under arrest for some reason by Smith. He immediately exited the car and went up to Smith and Willie. As Willie was being handcuffed and walked back to the police vehicle to be placed in the rear seat, Knittel asked him what room he was staying in at the motel and if anyone else was with him. The defendant responded that he was staying in Room 124, and that there were two other people who were currently in the room. Knittel asked the defendant this question because the defendant had denied that any anhydrous ammonia or methamphetamine-making equipment was

located in the car, and Knittel was very concerned that (particularly if the defendant was telling the truth about nothing being in the car) anhydrous ammonia or other methamphetamine precursor chemicals were being stored in a room at the motel, and that the smell originated in the room. He knew that the storing of these chemicals in a motel room which he knew to have hallway entrances would be very dangerous to any patrons of the motel. The motel had at least sixty rooms, and by the cars in the parking lot, he believed that the motel was occupied by numerous people.

Knittel testified that had the defendant refused to tell him the room number in which he was staying, that Knittel was sufficiently concerned about the presence of anhydrous ammonia that he would have gone immediately to the front desk of the motel and checked the registration to determine what room Willie was staying in and then gone immediately to that room to check out if it was occupied or if he could otherwise gain access to the room. The Eureka Police Department has a very close relationship with the motel, and the motel often notifies the police of anything suspicious going on at the motel or in the rooms. Knittel also knows from his prior police experience that the motel keeps detailed registration records for each room at the motel showing the name of the person in the room, the identification of the person who rents the room, and the signature of this person. It keeps these records both by the day and by the week. Knittel has gone to the front desk of this motel to check the registration in the motel by name or by room number on at least a dozen occasions prior to this date. Knittel would have immediately followed this same procedure and gone to the front desk and checked the registration of the room if the defendant had not immediately told him the room number or had refused to tell him the room number. Eventually, on that same day, Knittel did check the registration at the motel and found that the motel had a registration receipt for David Willie

staying in Room 124 at the motel. This receipt was introduced at the hearing on the motion to suppress.

As soon as the defendant told Knittel the room number, Knittel went immediately to Room 124 and knocked on the door. The door was answered by a person who identified himself as Peter Mikita and by a person who identified herself as Deborah. Knittel did not enter the room, but stood outside of the room and could see into the room through the open door. Knittel asked the two occupants what they were doing in the room, and they said they were friends of Willie and had helped him move into the motel. Knittel noticed that many boxes were stacked against the walls of the motel room.

Knittel then left the room and went back to the car. By this time, he noticed that Sgt. Randall, his supervisor, had arrived on the scene and was talking to Willie about getting consent to search his room. He heard Willie grant consent, and Randall and Officer Smith went off to search the room.

At this point, Knittel decided to make an inventory search of the contents of the car prior to towing it. Knittel also believed that he could search the car incident to the probable cause arrest of the defendant. Pursuant to the inventory search policy of the Eureka Police Department, the car had to be towed because it was blocking a fire lane, and there was no other person who could lawfully take custody of the car. According to this written policy, a detailed inventory of the contents of the car must be made before it is towed. This is done both for the safety of the public and the person towing and stowing the car in case there are any dangerous chemicals or substances in the car. The inventory search is also completed, according to the policy, to protect the safety and security of any valuables or other property left in the car by the owner.

Knittel then proceeded to search the car. In the backseat of the car, he found a digital scale which he knows to be used in the weighing and sale of narcotics, and he also found numerous boxes of clothing. In the trunk of the car, he found a tan lock box, a black lock box, and numerous boxes of men's and women's clothing. The black lock box was unlocked, and when Knittel opened and searched it, he found several plastic bags with a white substance he believed to be methamphetamine, and also several bags of marijuana. He field-tested the white substance, and it tested positive for methamphetamine. He also recovered in excess of $14,000 in cash from the lock box, and a computer printout of a newsgroup which appeared to contain directions for the manufacture of methamphetamine. The tan lock box was locked, and he asked the defendant if he would open the box, but he refused to do so.

At about the time the search of the car was being completed, Randall and Smith returned from searching the motel room and Knittel observed they were carrying two duffel bags.

As stated above, Sgt. Randall arrived at the parking lot at the motel as Knittel was returning to the car from his first visit to Room 124. As soon as Randall arrived, he identified himself to the defendant, and asked the defendant for permission to search the room. The defendant told Randall that he could search Room 124. Willie was not threatened in any way nor promised anything to grant consent to search the room and appeared to be rational. The conversation as to the search of the room was evidently low-key.

Randall and Smith then went to Room 124 and knocked on the door. The door was answered by Peter Mikita who let Randall and Smith into the room. Once in the room, Randall and Smith observed several boxes stacked along the walls of the motel room. As they looked through the room, they saw two duffel bags at the foot of one of the two double beds in the room. Randall noticed that

one of the ends of the duffel bag was open, and saw several packs of pseudoephedrine, a substance which Randall knows to be used in the manufacture of methamphetamine, in the end of the bag. When the bag was eventually opened and searched, it was found to be packed with pseudoephedrine, and to contain over 13,000 pseudoephedrine pills. When the other duffel bag was eventually searched, it was found to contain rubber gloves, mixing spoons, rubber tubing, plastic tubing, and other equipment which both Randall and Knittel know to be used in the manufacture of methamphetamine. Also observed in the room were several firearms stacked along the wall of the room. After observing this and searching the room, Randall took the duffel bags and left the room and gave them to Knittel out by the vehicle.

At this point, Knittel transported the defendant to the station. While he was booking the defendant, and not in response to any questions which Knittel asked him, the defendant told Knittel "If you bring me my keys, I will open the tan lock box for you." At this point, because Knittel did not know if any hazardous substances were in the box, he asked the defendant what was in the box. The defendant told him that drugs and money were in the box. Knittel told the defendant that the drugs were in the black box. When the tan box was opened and searched, it was found to contain documents which had no evidentiary value to the case. The contents of the tan lock box were eventually returned to the defendant.

At this point, Knittel noticed that some of the pseudoephedrine packets were pharmacists samples, and wanted to ask the defendant about their origin. He wanted to ask the defendant this because he believed they were not available to the general public and wanted to know how the defendant came into possession of these items. Because he was going to question the defendant at this point about other matters, Knittel for the first time in the entire process advised the defendant of

8

this rights. He did this from a written advice of rights form. He first read each right individually to the defendant and asked him if he understood the right. The defendant stated he understood each right and initialed the form indicating that he understood each right. He then read the waiver portion of the form to the defendant. The defendant did not initial the waiver form. Knittel did not ask the defendant why he did not initial the waiver form, and the defendant, after being advised of his rights and stating he understood his rights, nevertheless continued to talk to Knittel. It was Knittel's understanding that even though he did not initial the waiver portion, he was willing to talk to Knittel, and at no point during this part of the interview refused to continue talking or requested to speak to an attorney.

When Knittel asked the defendant about the sample packs, the defendant told him that if he returned all the money to him, the $14,000, he would tell Knittel everything. Because Knittel has no authority to make promises to the defendant or to return items of property, he told the defendant this. Det. Jones, an experienced narcotics investigator, then arrived at the office and Knittel and Jones went back to the motel to conduct interviews of Mikita and Deborah and the staff at the motel.

Upon their return, they again approached the defendant in order to interview him. They advised the defendant of his rights by showing him the waiver form and asking him if he had previously been advised of his rights. When he stated that he had, and prior to attempting to again interview the defendant, the defendant started to ask them questions. He asked Knittel how he had caught him, and Knittel said he was parked in a fire lane. Willie wanted to know if his wife turned him in, and before the officers could respond, Willie stated that he wanted to talk to an attorney. That was the first time the defendant had said that he wanted to talk to an attorney or did not wish to talk to the officers. The interview was ended at this point.

On the morning of June 11, 2003, Patrol Officer Craig Vaughn was asked to retrieve a set of U-Haul keys which belonged to David Willie from his vehicle on the impound lot. Vaughn was asked to retrieve the keys so Willie could move a U-Haul tow vehicle which he had previously rented. He was to return the keys to Willie. When Vaughn went to the car, he noticed that it was completely full of items. He had to search the entire car in order to find the keys. Initially, he could not find the keys in the passenger compartment of the car, and started looking in the trunk for the keys. In the trunk of the car, he observed a gas mask and several plastic funnels. He was aware that plastic funnels and a gas mask would be handy equipment to be used in the manufacture of methamphetamine, and seized the items. In addition, he seized a piece of paper with people's names, phone numbers, and amounts of money next to them. He, likewise, believed that this might be evidence of methamphetamine production or sale. Eventually, the keys to the U-Haul were found in the passenger compartment of the car.

## Conclusions of Law

A. The Original Encounter with the Defendant Including the Search of the Defendant's Pocket, His Arrest, and Non-Custodial Statement

Based on the above findings of fact, the undersigned concludes that the original encounter with the defendant, his search, arrest, and non-custodial statements were lawful.

The undersigned first concludes that the original encounter with the defendant is analogous to a traffic stop, only less intrusive than a traffic stop because it involved only a parking violation. In this regard, in United States v. Johnson, 58 F.3d 356 (8th Cir. 1995), a case similar to the one now at bar, the defendant was stopped for speeding and asked to sit in a highway patrolman's car. He was questioned as to his point of origin, his destination, and the purpose of his trip (why he was in the area). When the trooper was not satisfied with the defendant's responses to these questions, the

10

passenger in the defendant's car was also questioned and gave contradictory responses. Because these responses aroused the officer's suspicion as to whether or not the trip was legitimate, the defendant was asked if he was carrying anything illegal and if the car could be searched. When the defendant stated he was carrying nothing illegal and consented to the search, the trooper discovered that the gas tank on the vehicle had possibly been altered, and asked the defendant if he would drive the car to the highway patrol headquarters so that the car could be thoroughly examined. The defendant consented, and the examination of the gas tank revealed a hidden compartment that contained six kilograms of cocaine. In upholding this procedure, the court stated as follows:

> We have recently clarified that '[a]ny traffic violation, however minor, provides probable cause for a traffic stop.'
>
> . . .
>
> During a traffic stop, 'reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose.' Likewise, an officer may engage in similar routine questioning of the vehicle's passengers to verify information provided by the driver...Moreover, 'if the responses of the detainee and circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'
>
> . . .
>
> But here Mrs. Johnson gave an inconsistent explanation for their trip, further arousing McMullin's suspicions. ' If reasonably related questions raise inconsistent answers...a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive questions.' As in Ramos, the Johnsons immediately and voluntarily consented to the search of their vehicle. In these circumstances, the district court properly denied Johnson's motion to suppress.

United States v. Johnson, at 357-58. (citations omitted).

In addition, in Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop a person reasonably suspected of criminal activity, question the person briefly in an effort to confirm or dispel the suspected criminal activity, and when necessary conduct a limited pat down search for weapons. Whether or not officers possess reasonable suspicion is to be determined by the

court "not in terms of library analysis by scholars but as understood by those versed in law enforcement." United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996). Courts afford a great deal of deference to the conclusions of an officer because the officer may detect criminal activity from conduct that may seem innocent to the untrained eye. United States v. Cortez, 449 U.S. 411, 418-422 (1981).

In addition, a police officer may also approach a person on the street and ask to see his identification and ask other reasonable questions **without any reasonable suspicion** as long as the officer does not demand compliance with answers to his questions. See United States v. Perez-Sosa, 1998 WL 748710 (8th Cir. 10/28/98).

The undersigned concludes that much the same situation exists in the case now at bar as existed in the cases cited above. Initially, Knittel approached the vehicle because he noticed it had been involved in a parking violation, blocking a fire lane, and because the defendant was observed to be involved in the suspicious activity of loading several boxes into a vehicle at 4 a.m. at a motel. When Knittel approached the vehicle, he observed that the driver of the vehicle was David Willie who he knew to be a local resident of Eureka, and was aware that he lived in an apartment complex on the south side of town. Knittel thought it very suspicious that the defendant, a local resident, would be loading numerous boxes into his vehicle from a motel at 4 a.m. In addition, the defendant was extremely nervous considering that Knittel immediately informed the defendant that the only thing he was suspected of was a parking violation and, thus, subject only to a parking ticket.

In addition, Knittel noticed that the defendant had sores on his face and pock marks, similar to those of heavy methamphetamine users. Knittel also asked why the defendant was at the motel at that time of night, and the defendant stated that he had moved into the motel after separating from

his wife and was delivering clothing back to his wife. When Knittel asked the defendant where his wife was located, the defendant did not know where she was located. Knittel again thought this was suspicious since the defendant would be unable to deliver anything to his wife if he did not know where she was located. In addition, Knittel was aware that the defendant had reported his wife missing just a few days before.

In addition to all of this, Knittel smelled the strong smell of anhydrous ammonia coming from the defendant's body and from the car. Knittel knows that anhydrous ammonia is a precursor chemical for the manufacture of methamphetamine, and is highly volatile and dangerous both in closed and open areas. Because of this, Knittel, as was the officer in <u>United States v. Johnson</u>, <u>supra</u>, was justified in expanding his line of questioning to ask the defendant if he was carrying anhydrous ammonia or methamphetamine-making equipment in his vehicle.

In addition, because of the defendant's extremely suspicious activity and because Officer Smith, after his arrival, observed a pocket knife in the defendant's pocket, was justified in expanding the inquiry (as was the case in <u>Johnson)</u> to ask the defendant if his pockets might be searched. Therefore, the undersigned concludes that, as in <u>United States v. Johnson</u>, <u>supra</u>; <u>Terry v. Ohio</u>, <u>supra</u>, and <u>United States v. Perez-Sosa</u> <u>supra</u>, the initial encounter with the defendant was lawful.

Further, the undersigned concludes that the consent to search the defendant's pockets was voluntary. Police officers may search an individual's person if they obtain consent to do so from a person who has adequate authority to grant the consent. The consent is voluntary if it is the product of free choice and not given under coercion or duress. Voluntariness is a fact question to be determined from the totality of the circumstances present. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973); <u>United States v. Matlock</u>, 415 U.S. 164 (1974). Further, one need not be aware that he may

refuse to consent in order to make the consent voluntary. Among the factors to be considered in determining whether consent is voluntary include the following: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated or punished by police; whether the defendant relied upon promises or representations made by the police; whether the consent occurred in a public or secluded location, and whether the defendant objected to the search or passively looked on. See United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990). Applying the above law to the present case, the undersigned concludes there is little question that the consent to search his person was voluntarily given. The defendant was not threatened, coerced, or intimidated by police; the officers made no promises to the defendant to obtain his consent; consent was given in a public place while the defendant was standing outside the motel; the defendant was not restrained or under arrest when he was asked to consent to the search of his pockets, and the defendant did not object to any aspect of the search. Based on the above, the undersigned concludes that the defendant voluntarily consented to all aspects of the search of his pockets. Therefore, the discovery of the cut straw, which Officer Smith was aware was to be used as narcotics paraphernalia in the consumption of methamphetamine, and the white crystals found therein were lawfully seized. Further, the undersigned concludes that once the cut straw with the methamphetamine residue was found, there was strong probable cause to arrest the defendant for possession of drug paraphernalia. See Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Thus, the defendant's arrest was lawful.

Further, the undersigned concludes that the defendant was not in custody during the initial questioning and stop in the parking lot before he was arrested, and the defendant's statements prior to being arrested were voluntary and lawfully obtained.

The Supreme Court has held that in most routine traffic stop situations as well as in Terry stop situations, such as the one in this case, the defendant is not in custody for the purposes of being given his Miranda warnings. In so holding, the Court stated as follows:

> '[T]he stop and inquiry must be "reasonably related in scope to the justification of their initiation." ' Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and try to obtain information confirming or dispelling the officer's suspicions...The comparatively nonthreatening character of detention of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompt us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda.

Berkemer v. McCarty, 468 U.S. 420, 439, 440 (1984).

The determining factor as to whether the defendant is in custody is whether or not a reasonable person in the defendant's position would believe that he was, in fact, in custody or that his movement was restricted in any significant manner. See Berkemer v. McCarty, supra.

In United States v. Boucher, 909 F.2d 1170 (8th Cir. 1990), a highway patrolman stopped the defendant for a traffic violation. After approaching the vehicle, he requested that the defendant get out of his pickup truck. As the defendant left his truck, the officer observed a pistol partially concealed between the seats of the truck. The officer immediately patted down the defendant and asked him to sit in the patrol car. He did not tell the defendant that he observed the weapon or that he was going to arrest him for carrying a concealed weapon. While the officer and the defendant were seated in the patrol car, the officer asked the defendant if he had any weapons or drugs in his truck. The defendant said he had no weapons or drugs in the truck. When the truck was eventually searched, the officer recovered the gun he had observed, a second loaded weapon, and over fifty

pounds of marijuana. In ruling that the defendant's initial statements should not be suppressed, the court stated as follows:

> A reasonable person in Boucher's position would not have considered Cooper's questioning in the patrol car a custodial interrogation. Boucher was unaware that Cooper had seen the gun in the seat. Boucher had no reason to suspect that Cooper knew of the gun or anything else in the pickup truck at that point and had no reason to believe that he was suspected of anything other than speeding. Furthermore, as noted above, Cooper was already aware of the gun in the pickup, and it was reasonable for him to question Boucher about it prior to Miranda warnings.

United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990).

Based on the above law, the undersigned concludes that the defendant was not in custody as to the initial questions asked of him prior to being arrested and handcuffed. The defendant was in his own vehicle or standing in a public parking lot in full view of anyone driving by the location. Further, the defendant was left standing behind his vehicle by himself while Officer Knittel went back to his car to write a ticket. Thus, as in Boucher, supra, the defendant had no reason to believe that he was in custody prior to being handcuffed. The most that the defendant could believe was that he was suspected of committing a mere parking violation. Therefore, the undersigned concludes that the statements made by the defendant prior to his arrest should not be suppressed on the grounds that Miranda warnings were not given. See Berkemer v. McCarty, supra; California v. Beheler, supra. Further, the defendant was not threatened or intimidated in any way by Knittel, and in fact was initially cooperative with him. Thus, his statement was voluntary. See Miranda v. Arizona, 384 U.S. 436 (1966). Therefore, the undersigned concludes that the defendant's statements prior to arrest should not be suppressed.

    B. Statement Made by the Defendant as to the Room Number Where he was Staying and Whether or not he was with Anyone

16

Based on the above facts, the undersigned concludes that the defendant's statement that he was staying in Room 124 with two other people was lawfully obtained pursuant to the "public safety" exception to the Miranda rule as enunciated in New York v. Quarles, 467 U.S. 649 (1984). Under the New York v. Quarles exception, a suspect's answers to questions from a police officer are admissible in the absence of Miranda warnings even if the defendant is handcuffed so long as the questions asked of the subject are "reasonably prompted by a concern for public safety." United States v. Quarles, 467 U.S. 649, 656 (1984).

Further, in the case of United States v. Williams, 181 F.3d 945 (8th Cir. 1999), a case which is analogous to the case now at bar, the defendant was arrested, placed face down on his bed, and handcuffed. Prior to being advised of his rights, the arresting officer asked him, "Is there anything else we need to be aware of?" In response, the defendant told them that there was a gun in the closet. In upholding the question and answer in this matter, as within the public safety requirement, the court stated as follows:

> The court believes public safety concerns were an issue in this case. Although Williams' hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way. Therefore, the district court did not commit error by admitting Williams' statement identifying the location of the gun.

181 F.2d 945, 953, 954.

Further, in holding that questions from a police officer need not be related to weapons, but only need to be related to public safety even though not asked in that form, the court stated as follows:

> [T]he questions sought information related to weapons or **other safety concerns.** The fact that the question was also broad enough to elicit other information does not prevent application of the public safety exception when safety was at issue. Moreover, we believe that conditioning admissibility of evidence under the public safety exception to an officer's ability to ask questions in a specific form would run counter to the <u>Quarles</u> Court's decision that an officer may forego announcement of Miranda warnings when public safety is threatened. The <u>Quarles</u> Court believed that the value of Miranda warnings was outweighed by safety concerns in situations 'where spontaneity rather than adherence to a police manual is necessarily the order of the day.' <u>Quarles</u>, 467 U.S. at 656. Under the circumstances of this case, the concerns for the safety of the officers required a spontaneous inquiry by the officer.

<u>United States v. Williams</u>, 181 F.3d 945, 954 n.13. (emphasis added).

In addition, <u>Williams</u>, <u>supra</u>, noted that the officers did have information suggesting that Williams may have possessed firearms or explosive devices. <u>See</u> <u>also</u> <u>United States v. Luker</u>, 395 F.3d 830 (8th Cir. 2005) (question of arrested person whether anything could stick or poke the officer when performing a pat down search, and asking whether there was anything in the arrested person's vehicle that should not be there, held within the exception of the public safety requirement.)

Based on the above law, the undersigned concludes that the question to the defendant of what room he was staying in and if anyone was with him was within the public safety exception to the <u>Miranda</u> rule. Knittel explained that he asked the defendant very shortly after his arrest about the room number because the defendant had denied that anhydrous ammonia or methamphetamine-making equipment was located in the car, and the officer was very concerned that the anhydrous ammonia which he had smelled was being stored in a room at the motel. The defendant had already told him that he had moved into the motel and was staying at the motel, and if the smell of anhydrous ammonia was not coming from the vehicle or from the defendant's person, then Knittel believed it must have originated in the room. Knittel knew that the storing of anhydrous ammonia in a motel room which he was aware had hallway entrances would be extremely dangerous to any patrons of

the motel. He was aware that anhydrous ammonia was a highly toxic substance which could "suck the air" out of a person's lungs and make it extremely difficult and dangerous to breathe. Further, the motel had at least sixty rooms, and he believed that the motel was occupied by numerous people. Therefore, the undersigned concludes that, as in United States v. Williams, supra, Knittel had ample reason based on the smell of anhydrous ammonia and the defendant's actions and the finding of methamphetamine on his person to believe anhydrous ammonia might well be being stored in his motel room. If this was true, it presented a genuine and immediate public safety concern which justified Knittel asking the defendant what room he was staying in so that this could be determined immediately and be checked out for public safety reasons. The fact that the question did not relate directly to public safety but only to a room number does not, as in Williams, preclude its asking. Therefore, the defendant's answer that he was staying in Room 124 with two individuals should not be suppressed.

As stated above, the undersigned concludes that the question as to what room the defendant was staying in and the defendant's answer should be admissible pursuant to the public safety exception in New York v. Quarles, supra. However, the undersigned further concludes that even if the defendant's statement should be suppressed as being an unwarned custodial statement, the items found in Room 124 and the room receipt should nonetheless not be suppressed.

In allowing the introduction of physical evidence discovered as a result of a potentially illegal statement, the court stated as follows:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means–here the volunteers' search–then the deterrence rationale has so little basis that the evidence should be received.

Nix v. Williams, 467 U.S. 431, 433 (1984). See also United States v. Martin, 982 F.2d 1236 (8th Cir. 1993). In United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997), the court stated that evidence otherwise discovered through an illegal confession should be admitted if the government proves by a preponderance of the evidence that 1) there was a reasonable probability that the evidence would have been discovered by lawful means, and 2) the government was pursuing an alternative line of investigation at the time of the violation.

The undersigned concludes that almost exactly the same situation exists in the case now at bar as existed in United States v. Conner, supra. In the case now at bar, Knittel testified that he was extremely concerned about the presence of anhydrous ammonia in the motel, and that is why he asked the defendant his room number. Knittel also testified that had the defendant not told him the room number, he would have immediately gone to the front desk of the motel and checked the registration to determine what room Willie was staying in, and then would have gone immediately to that room to check if it was occupied and if he could gain access to the room. Knittel knew from his prior police experience that he could obtain this information from the front desk of the motel. Knittel was aware that the motel kept detailed records for each room at the motel showing the name of the person in the room, the identification of the person who rents a room, and the signature of this person. Knittel had checked these records to determine the registration of a person by name or by room number on at least a dozen occasions prior to this date. Further, the fact that Knittel was actively pursuing this line of investigation and would have inevitably discovered the room is proven by the fact that Knittel did, in fact, check the motel registration the same day and found that Willie was registered to stay in Room 124.

The undersigned concludes that the above shows, at the very least, by a preponderance of the evidence that Knittel, would have discovered the room number that the defendant was staying in whether or not the defendant had told him the room number. At the time he asked the defendant the room number, Knittel was aware that the motel kept detailed records on the defendant's room registration, and that Knittel could check the room number immediately in order to pursue a search of the room, even if the defendant had not told him the room number. Just as importantly, Knittel did inevitably discover that the defendant was registered in Room 124. Therefore, the undersigned concludes that Knittel would have inevitably discovered the room number whether or not the defendant told him that he was staying in Room 124. Therefore, the undersigned concludes that any items otherwise seized lawfully from Room 124 should not be suppressed.

C. Search of Room 124 and the Seizure of the Duffel Bags and any Other Items from the Room

Based on the above findings, the undersigned concludes that the search of Room 124 was a consensual search and was lawful.

Preliminarily, the undersigned concludes that it was not necessary for Sgt. Randall to advise the defendant of his Miranda rights prior to asking him to consent to the search of the room.

In upholding this procedure, the court stated as follows in United States v. Lagrone, 43 F.3d 332 (7th Cir. 1994):

Lagrone next claims that after he asked to talk to his attorney, the authorities should have ceased 'interrogating' him about whether he would sign the consent to search form. Our decision in United States v. Glenna, 878 F.2d 967 (7th Cir. 1989) precludes this argument. In Glenna we held that because requesting consent to search is not likely to elicit an incriminating statement, such questioning is not interrogation, and thus Miranda warnings are not required. Other circuits are in accord with this principle.

United States v. Lagrone, 43 F.3d 332, 335 (7th Cir. 1994); see also Cody v. Solem, 755 F.2d 1323 (8th Cir. 1985).

      The undersigned further concludes that the consent to search the room was voluntarily given and therefore the search of the room and the seizure of the duffel bags and the pseudoephedrine was lawful. To determine whether or not a consent to search is voluntarily given, the totality of the circumstances surrounding the consent must be examined. Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Further, one not need be aware that he may refuse to consent in order to make the consent voluntary. Among the factors to be considered in determining whether consent is voluntary include the following: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied on promises or representations made by the police; whether the consent occurred in public or in a secluded location; whether the defendant objected to the search or looked passively on, and the degree to which the defendant cooperated with police. See United States v. Chaidez, supra.

      Applying the above law to the present case, the undersigned concludes that consent to search was voluntarily given. The defendant had been under arrest for a very brief period of time when he was asked to consent; the defendant was not threatened, coerced or intimidated in any way into giving his permission to search the room; the defendant was not promised anything to grant his consent to search the room; the defendant did not object to any aspect of the search; the defendant, at least up to the point where he consented to the search of the room, was cooperative with the authorities, and the consent, although the defendant was handcuffed in the back of a police car, nevertheless occurred in an open parking lot and not in a "secluded area." Based on the above, the

undersigned concludes that the defendant's free will to not consent was not overborne, and based on the totality of the circumstances including the lack of threats and promises and the relative low-key nature of the interview, the defendant's consent was voluntary. Therefore, the search of the room was based on voluntary consent, and the seizure of any item from it should not be suppressed.

### D. The Search of the Car

Based on the above facts, the undersigned concludes that the search of the car was lawful both as a probable cause search of the vehicle and a valid inventory search.

Initially, the undersigned concludes that there was strong probable cause to search the vehicle based on the strong smell of anhydrous ammonia emanating from the car along with the methamphetamine in the straw seized from the defendant's person, the sores on his body, and his extreme nervousness. In United States v. Kleinholz, 339 F.3d 674 (8th Cir. 2003) and in United States v. Walsh, 299 F.3d 729 (8th Cir. 2002), the Eighth Circuit recognized the inherent and multiple dangers involved when the presence of precursor chemicals such as ether or anhydrous ammonia are found in an area. In Kleinholz, officers received an anonymous tip that methamphetamine was being produced at a particular house. They went to the area of the premises and smelled the strong odor of ether. Without obtaining a valid consent or other search warrant, the officers entered the house, viewed the illegal methamphetamine lab, made sure all of the occupants were out of the house and unarmed, and then exited the house and attempted to obtain a valid consent to search the house. In upholding the warrantless search of the house to determine whether methamphetamine was present, the court stated as follows:

> In the present case, several factors suggest the existence of probable cause. Law enforcement officers had received information from an anonymous informant indicating that an illegal methamphetamine lab was in the front bedroom of a house in an area of and similar to Kleinholz's...Most importantly, however, law enforcement

officers smelled ether: a substance known to be used in the manufacture of methamphetamine. The smell of ether might alone support a finding of probable cause...But certainly such an odor coupled with other facts support a finding of probable cause. The facts of the present case taken together indicate probable cause existed to believe that Kleinholz's front bedroom contained a methamphetamine lab. Due to the volatile nature of such labs, exigent circumstances justified an immediate limited search.

United States v. Kleinholz, 339 F.3d 674, 676, 677.

Further, in defining the scope of the warrantless search the court stated as follows:

In the case at bar, law enforcement officers entered Kleinholz's house to confirm their suspicion a methamphetamine lab was being operated and to reduce the immediate risks of fire and explosion posed by such a lab. Upon confirming the presence of the lab, law enforcement was further justified in reentering the house to make the lab safe. Thus the initial entries, though without benefit of a warrant, were not unconstitutional, and did not, therefore, taint the written consent obtained from Kleinholz. Besides, once law enforcement had entered the house legally, pursuant to probable cause and exigent circumstances, they were not required to ignore the illegal drug operation; rather, they were free to take note of and even seize everything in 'plain view.'

United States v. Kleinholz, 339 F.3d 674, 676, 677.

Further, the Eighth Circuit has held that the smell of drugs or precursor chemicals alone may justify probable cause to search a vehicle. See United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000); United States v. Walsh, supra.

Based on the above, the undersigned concludes that Knittel had strong probable cause to search the vehicle, arguably even stronger probable cause than that which existed in Kleinholz. In the case now at bar, as in Kleinholz, supra, and McCoy, supra, the smell of anhydrous ammonia, an extremely dangerous substance (as dangerous as ether), alone would justify probable cause to search the car given its inherent dangers. In addition, in the current case the officers also seized crystals from the defendant's pocket which tested positive for methamphetamine. Thus because, Knittel was aware that the defendant was, at the very least, using methamphetamine and possessed it in his vehicle

along with the strong smell of anhydrous ammonia, a product used to manufacture methamphetamine, the undersigned concludes there was strong probable cause to search the vehicle. This is particularly true when Knittel also observed that the defendant had sores and exhibited nervous behavior which indicated methamphetamine use. Thus, based on the above, the undersigned concludes that there was ample probable cause to search the vehicle.

In addition, having obtained probable cause to search the vehicle, it could be searched without first obtaining a search warrant under the moving vehicle doctrine. See Chambers v. Maroney, 399 U.S. 42 (1970); Arkansas v. Sanders, 442 U.S. 753 (1979). Further, this probable cause existed whether the vehicle was searched at the scene of the stop or after it had been towed for safety reasons to another area. The undersigned concludes that the car could be searched at a second location on a later date if it could have been searched at the scene of the arrest. See also Capraro v. Bunt, 44 F.3d 690 (1995).

In addition, all of the evidence seized from the vehicle including the plastic tubing, the digital scales, the drugs from the black box, the instructions on how to make methamphetamine, as well as the gas mask and other plastic tubing were lawfully seized as evidence of methamphetamine production.

Additionally, the undersigned concludes that the search of the car was a valid inventory search of the vehicle. Officer Knittel testified that the department policy requires that the vehicle be towed because it was blocking a fire lane, and there was no one to take custody of it. The written policy of the department is that items must be inventoried thoroughly and itemized, and closed containers searched before the vehicle is towed. The purpose of the policy is to protect anyone touching the vehicle or towing it, or neighbors in the area from dangerous or hazardous substances or chemicals,

and to safely secure any valuables that might be in the vehicle for the benefit of the owner. The officer testified this policy was followed, and an inventory was made of the property seized.

Therefore, the undersigned concludes because Knittel followed this written policy in conducting the inventory search for reasons of both security of the items in the car and the safety of those towing the vehicle, that the search was properly conducted, and that evidence obtained from the vehicle should not be suppressed. In this regard, Knittel followed the tenets of <u>Colorado v. Bertine</u>, 479 U.S. 367 (1987); <u>Illinois v. Lafayette</u>, 462 U.S. 640 (1983). Therefore, the inventory search was valid and nothing seized from the car should be suppressed.

### E. The Post Arrest and Pre-Advice of Rights Statements Made by the Defendant

According to the evidence at the motion to suppress, the defendant was arrested shortly after 4 a.m., and placed in custody and in handcuffs, but not advised of his rights in any form until an hour and forty minutes after his arrest at about 5:40 a.m. at the police station. Therefore, any statements made by the defendant in the intervening period of time should be suppressed because they are the product of unwarned custodial interrogation and, therefore, should be suppressed according to <u>Miranda v. Arizona</u>, 384 U.S. 436, 467-75 (1966); <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979); <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986); <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

One exception to this which has already been explained in detail above, is the defendant's statement that he was staying in Room 124 with other persons. This statement was made pursuant to the public safety exception to the <u>Miranda</u> rule and, thus, should not be suppressed. Similarly, the defendant's volunteered statement that he would open the tan box if the key was brought to him by Knittel should not be suppressed. This statement did not come in response to any question by police officers, and was an entirely volunteered statement from the defendant. The defendant merely stated,

not in response to any question or prodding by Knittel, that he would open the tan box if Knittel brought him the key. This, the undersigned concludes, is a voluntarily made, volunteered statement and should not be suppressed. See Rhode Island v. Innis, 446 U.S. 291 (1980). All other statements should be suppressed.

In this regard, the government also contends that the defendant's statement that drugs and money would be found in the tan box in response to Knittel's question as to what was in the box should not be suppressed because the question was not intended to elicit a "guilt-seeking" response. The Supreme Court has defined interrogation as being "words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response from the suspect." See Rhode Island v. Innis, 446 U.S. 291, 300-301. The Court in Innis also made clear that this determination focuses primarily on the suspect's perception of the question.

Given the above, the undersigned concludes that the evidence in this case shows that the police should have known that the question was likely to elicit an incriminating response. Prior to asking this question, Knittel and other officers found a large amount of incriminating evidence both in the car from where the tan box was seized as well as in the room to the motel. In addition, a similar type black box had been searched by Knittel and found to contain drugs and money. Therefore, the undersigned concludes that the question, "What's in the box?" was quite likely to elicit an incriminating response and, therefore, should be suppressed along with defendant's response.

In addition, the government argues that this statement should be allowed into evidence because it is subject to the public safety exception or exclusionary rule. The officer testified he asked the defendant this question because he was concerned about whether any dangerous instrumentalities might be in the box. The undersigned concludes that under the circumstances, the question and the

response do not meet the public safety exception. First, the question was unwarned, and came at least an hour and a half after the defendant had been arrested but had yet to be advised of his rights. Thus, the exigency of the situation had passed. The <u>Quarles</u> court plainly believed that the value of <u>Miranda</u> warnings was outweighed by safety concerns only in situations "where spontaneity rather than adherence to a police manual is necessarily the order of the day." <u>Quarles</u> 467 U.S. at 656. This question was asked at a time markedly different than the question as to what room the defendant was staying in which came immediately after his arrest. This question, as stated above, was asked more than one-and-a-half hours after the defendant was arrested, and the undersigned concludes that spontaneity can not rationally be said to be involved so much time after the defendant's arrest. Therefore, the statement should be suppressed on this ground.

In addition, the undersigned notes that this question was asked **after** the search of the black box, a complete search of the trunk of the car, and a search of the room without any supposed public safety question being asked of the defendant about what was in the room, what was in the car, or what was in the black box. Therefore, based on the above, the undersigned concludes that the statement was not made pursuant to the public safety exception and should be suppressed.

<u>F. Post Miranda Rights Statements Made by the Defendant</u>

As stated above, the defendant was fully advised of his rights at approximately 5:40 a.m. on June 10, 2003. This was accomplished by Knittel reading the defendant from a written waiver form each one of his rights individually, and individually asking the defendant if he understood each right. The defendant stated that he understood each right and initialed the form stating that he understood each right. Although the defendant did not initial the waiver portion of the <u>Miranda</u> form, his rights had been fully explained to him and he stated he understood his rights, and the defendant after this

continued to talk to the officers and readily responded to their questions. Based on the above, the undersigned concludes that the defendant, after having been fully advised of his rights in writing and stating he understood those rights, the fact that he continued to respond to questions from the officers is adequate to show an adequate waiver on the part of the defendant of his Miranda rights. See United States v. House, 939 F.2d 659 (8th Cir. 1991) (defendant's waiver may be inferred from the fact that the defendant responded to questions after being advised of and understanding his rights); United States v. Ramirez, 79 F.3d 298 (2nd Cir. 1996) (valid waiver inferred because after having been given Miranda warnings and agreeing to speak with officers, defendant answered some questions and remained silent on others). Therefore, the undersigned concludes that the defendant was fully advised of his rights, stated he understood those rights, and knowingly waived his rights by agreeing to talk to Knittel and the other officer. The undersigned further concludes that based on the totality of the circumstances, the defendant's statements were voluntarily made and his free will was not overborne by anything that took place in the interview. The defendant was not threatened in any way, nor promised anything in return for his statements, and the officers scrupulously abided by the defendant's wishes. They immediately ceased questioning him when he finally stated he wanted to talk to a lawyer. Therefore, the defendant's post-Miranda statement should not be suppressed. See Miranda v. Arizona, supra; North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1985).


**Conclusion**

Therefore, the defendant's motion to suppress should be granted in part and denied in part consistent with the memorandum above.

* * *

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that (Doc. #15) Defendant's Motion to Suppress Evidence and Statements be **granted in part and denied in part**.

The parties are advised that they have eleven (11) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Further,

An order setting a date for trial is forthcoming from the Honorable Carol E. Jackson, United States District Judge.

<u>        /s/ Terry I. Adelman        </u>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>27th</u> day of April, 2005.